IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 4:04CR3111 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| LEOPOLDO ROMO, | ) | |
| | ) | |
| Defendant. | ) | |

Oversimplified, the "safety valve" gives a non-violent drug offender, who has no or very little criminal history, an opportunity to reduce his advisory Guidelines range, and avoid a statutory minimum sentence, by truthfully telling the government what he knows.  U.S.S.G. §§ 2D1.1(b)(7)[1] & 5C1.2 (2005).  The offender is not required to help the government beyond giving the interview.

I must decide whether a lawyer wrongly failed to advise his client that he could take advantage of the "safety valve" without also agreeing to become a "snitch." After a day-long evidentiary hearing, I conclude that the counsel acted properly.

## I.  BACKGROUND

Initially, I discuss the underlying criminal case and the filing of the section 2255 motion.  After that, I detail the facts presented at the evidentiary hearing.

### A.  The Underlying Criminal Case and the § 2255 Motion

On April 28, 2005, and after I accepted a plea agreement, Leopoldo Romo ("Romo") was sentenced to 70 months in prison for distribution and possession with

---

[1]This provision is renumbered as U.S.S.G. § 2D1.1(b)(9) in the 2006 manual.

intent to distribute methamphetamine on August 4, 2004.  (Filing 42 (Judgment).)[2] Romo had pleaded guilty pursuant to a non-cooperation plea agreement that was signed by Romo and his lawyer, Assistant Federal Public Defender John Vanderslice ("Vanderslice") on February 4, 2005.  (Filing 25.)

The plea agreement, made pursuant to Rule 11(c)(1)(C), limited Romo's exposure in terms of drug quantity to between 350 and 500 grams of methamphetamine.  (Id. ¶ 9.)  As we shall see, this agreed quantity was less than the quantity attributed to Romo by a cooperating individual.

Because of this plea agreement, Romo was allowed to plead guilty to a possession charge that provided a statutory minimum sentence of 5 years and a statutory maximum sentence of 40 years.  The remaining portions of the second superseding indictment (filing 14), charging a conspiracy involving more than 500 grams of methamphetamine and other substantive distribution counts, were dismissed as a result of the plea and plea agreement.  Romo thus escaped exposure to a statutory minimum sentence of 10 years, and a maximum prison sentence of life.

Romo speaks Spanish, and he does not speak English fluently.  As a consequence, at all proceedings, Romo received the services of an interpreter employed by the court.   As discussed later, the evidence also discloses that when Vanderslice privately conferred with Romo, a qualified interpreter was always present and interpreted for Romo and Vanderslice.

---

[2]This filing, and others, were marked as exhibits and received into evidence. However, rather than referring to the exhibit numbers for documents which are also part of the "court file," and for the sake of both clarity and ease of access, I refer to the filing numbers in the computerized record keeping system of the court ("CM/ECF").   Consequently, I only refer to exhibit numbers when a document received into evidence is not a part of CM/ECF.

Based upon the drug quantity set forth in the plea agreement and Romo's acceptance of responsibility, Romo had a total offense level of 27 and a criminal history category of I under the advisory Guidelines. (Filings 44 & 45 (Presentence Report & Sentencing Recommendation).) This meant that the low end of the advisory Guidelines was 70 months in prison.

Romo did not qualify for the "safety valve" because he did not submit to the required interview. (Filing 45 (Sentencing Recommendation).) Indeed, and while Vanderslice initially objected to the presentence report because it failed to give Romo credit for the "safety valve" (filing 34), counsel withdrew the objection at the time of sentencing. (Filing 55 at CM/ECF pp. 3-4.)

At sentencing, and regarding the "safety valve," the following exchange took place between Vanderslice and me:

> THE COURT:     All right. Now, tell me about the safety valve.
>
> MR. VANDERSLICE: Yes, Judge. It appeared through the presentence report that Mr. Romo was eligible for safety valve except for that he had not given an interview. I'd spoken with him about that with our interpreter from our Omaha office, Mr. Navarrete, back in—it was about two weeks ago, and Mr. Romo informed me that he did not wish to give a statement, and so we would withdraw our objection to the safety valve.
>
> (Id.)

Shortly after that discussion, I asked Romo whether he wished to say anything before sentence was pronounced. He answered, "No, that's fine." (Filing 55 at CM/ECF p. 6.)

-3-

Romo did not appeal.   However, after Romo got to prison, and on January 5, 2006, he filed a § 2255 motion claiming that Vanderslice had rendered ineffective assistance of counsel.  (Filing 46 at CM/ECF p. 4.)   Under penalty of perjury, Romo stated:   "Mr. Vanderslice told me that in order to qualify for the Safety Valve provision I would have to actively assist the Government in the investigation and prosecution of my accomplices."  (Filing 48 ¶ 4.)

In the declaration, Romo also stated that this conversation occurred in November of 2004; that he had asked Vanderslice about qualifying for the "safety valve"; that Vanderslice advised Romo to think about the possibility of cooperating with the government in order to qualify for the "safety valve"; that Romo had responded that he did not want to cooperate because he feared for his family; and, despite not wanting to cooperate, that he was "willing to be debriefed by the Government about my involvement in the case and the identity and role played by others known to me to have participated in the criminal conduct."   (Id. ¶¶ 3, 5–7.) According to Romo, after this November conversation, Vanderslice never mentioned the "safety valve" again.  (Id. ¶ 7.)

After initial review of the motion, and pursuant to my order, the government submitted an answer and Vanderslice's declaration.   (Filing 59, Attach. 1.) Vanderslice generally denied that he had confused "safety-valve" eligibility with "cooperation," and specifically stated that Romo and he had discussed Romo's unwillingness to give a "safety-valve" interview on April 15, 2005.  (Id.)

After that, Romo submitted a responsive declaration that denied Vanderslice's assertions.   In particular, Romo stated that while Vanderslice and he did discuss cooperation on April 15, 2005, the "safety valve" was not mentioned.  (Filing 61 ¶ 11.)

-4-

These dueling declarations caused a material factual dispute. As a result, I appointed counsel to represent Romo, and ordered an evidentiary hearing.[3]

## B.   The Facts From the Evidentiary Hearing

Although additional details were presented, the facts presented at the evidentiary hearing held on September 25, 2006, paralleled the declarations of Romo and Vanderslice. Romo testified, as did Vanderslice. Jeck-Jenard Navarrete ("Navarrete"), a full-time employee of, and an interpreter for, the Federal Public Defender, also testified. He confirmed Vanderslice's statements.

### Romo

Romo reiterated much of what he had said in his declarations. That is, he and Vanderslice met in November of 2004, they talked about cooperation and the "safety valve" was mentioned.[4] Romo said Vanderslice explained what "cooperation" entailed, including the requirement of testifying. Romo told Vanderslice that he was willing to tell the government what he knew, but he did not want to cooperate. Romo said that Vanderslice did not clearly explain the difference between a "safety-valve" interview and "cooperation." According to Romo, the only time the "safety valve" was mentioned was in this November meeting.

---

[3]Joel Lonowski was appointed to represent Romo. He did a very good job representing Romo. I thank Mr. Lonowski for his service.

[4]Romo said an interpreter by the name of "Mr. Raul" was present and assisted the parties. Vanderslice later confirmed that a freelance interpreter, Raul Escobar, was present for the meeting. Vanderslice also indicated that Escobar was very well-regarded and frequently interpreted for the Nebraska courts. Navarrette, the Defender's staff interpreter, maintains his primary office in Omaha, Nebraska. He was not available for this conference which was held in Lincoln, Nebraska.

-5-

Romo also explained that at the November meeting, Vanderslice questioned Romo's account of the crime. Romo said that he told Vanderslice that he had obtained approximately a pound of methamphetamine from Mario Sanchez, in exchange for a Geo Tracker automobile[5]; that he obtained the methamphetamine in February of 2004; that he had held the methamphetamine until the summer of 2004; that he distributed all of it, in five or six separate sales, in the summer of 2004; and that he had no other connection with drugs. As recounted by Romo, Vanderslice said the police probably would not believe him. According to Romo, Vanderslice told Romo at the November meeting to think about his story further.

Romo confirmed that he had other discussions with Vanderslice, but he testified that the "safety valve" never came up again. He specifically acknowledged that one such discussion occurred on April 15, 2005, after he had signed a non-cooperation agreement in February of 2005, and shortly before sentencing. While cooperation was discussed and Vanderslice told him this was "his last chance," the "safety valve" was not mentioned.

Romo confirmed that Navarrette served as the interpreter for this session. In order to get the sentence reduction, Romo said Navarrette told him that Romo would have to do the same thing as the man who "fingered" Romo.

I digress for a moment. The man who "fingered" Romo was Victor Alarcon who was cooperating with the government and who had given a statement to the government on November 11, 2004. (Ex. 16.) The government dutifully provided that statement to the defense.

_____

[5]Romo told me that the car was manufactured in 1991 and it had over 100,000 miles when he exchanged the car for the drugs. He also told me that he sold the methamphetamine for $450 per ounce. He confirmed that he provided Vanderslice with this information.

Vanderslice tried to interview Alarcon, but Alarcon's lawyer would not agree to an interview.  Vanderslice's records indicate that Vanderslice spoke with Romo about Alarcon in January of 2005.  (Ex. 10 (entries for Jan. 20 & 27, 2005); Ex. 11 (Vanderslice's handwritten notes of Jan. 20, 2005).)

Alarcon implicated Romo in 10 to 15 distributions.  (Ex. 16.)   Between the distributions actually made by Romo to Alarcon, and additional quantities of methamphetamine that Alarcon observed on Romo's person, Alarcon said that Romo was involved with a minimum of 1.5 pounds and up to nearly 2 pounds of methamphetamine.  Alarcon also told the government that Romo was distributing drugs to another person by the name of "Charo" who drove a red Amigo.

In sum, Romo testified that had he known that he could have given a "safety-valve" interview, but not cooperate further, he would have done so.  However, Romo testified that he did not understand that he could do so because of his conversations with Vanderslice.   On the contrary, Romo thought he would have to do what Victor Alarcon had done.

### *Vanderslice*

Vanderslice testified that he had 18 years of experience practicing criminal law.  He had been Assistant Federal Public Defender for 10 years.  He explained that he had handled many cases involving Spanish-speaking defendants, drugs, cooperation, and the "safety valve."   He was adamant that he would not have confused "cooperation" and eligibility for the "safety valve" and that he would have clearly informed Romo that the only thing he needed to do to qualify for the "safety valve" was to give a truthful and complete statement to law enforcement.

Vanderslice also explained the Federal Public Defender requires his employees who are lawyers, paralegals, or interpreters to keep a contemporaneous time log when

they work on individual cases.  The government introduced into evidence a specimen of such a log.  (Ex. 9 ("FDO TimeKeeper").)  The data from each time log is put into a computer and the computer can then produce a "Case History Report" which compiles all of the entries for that particular client.  The government introduced into evidence the "Case History Report" for Romo.  (Ex. 10.)

By reference to the "Case History Report," Vanderslice stated that his first meeting with Romo probably occurred on October 29, 2004, rather than in November as Romo had testified.  According to the "Case History Report," Vanderslice spent about 1.5 hours talking with Romo.  (Ex. 10, entry for Oct. 29, 2004.)  The Report indicated that Vanderslice and "Raul," the interpreter, spoke with Romo about "R16 [the discovery process], PTM [pretrial motions], USSG [the Sentencing Guidelines] and  coop [cooperation]."  (Ex. 10, entry for Oct. 29, 2004.)

Vanderslice testified that he may have mentioned the "safety valve" at this meeting, but probably did not discuss it in detail.[6]  This was because one could never be sure of a defendant's true criminal history until after the presentence report was completed, and without knowing that history and thus the defendant's eligibility for the "safety valve," a premature discussion on that subject was inappropriate.

Although Vanderslice could not be certain since the notes are undated, Defendant's Exhibit 101 may be Vanderslice's notes of what Romo told him at that

---

[6]Exhibit 17 is a one-page copy of a drug quantity table and sentencing table that Vanderslice used to explain sentencing exposure to Romo.  Vanderslice was sure that he would have used this document at this first meeting.  However, the handwritten notations on the exhibit may have been made at various times throughout Vanderslice's representation of Romo.  With this qualification in mind, this exhibit reflects that Vanderslice discussed the "SV" ("safety valve") with Romo at some point during the course of the proceedings.  As discussed more fully later, other documents reflect the same thing.

October meeting. Those notes reflect that "[p]retty much everything is the truth that's in there" (apparently referring to the original indictment which alleged three distributions), and that Romo got "1 ½ LB of Meth" from Mario Sanchez in exchange for a 1990 Geo Tracker in February of 2004. The notes reflect that this quantity was the "<u>only</u> Meth" that Romo got and that he sold the drugs by the "oz [ounce] or ½ [ounce]." (Ex. 101 (emphasis in original).)

Vanderslice did recall that the story Romo told him about obtaining a large quantity of drugs in exchange for a car struck him as odd and that he told Romo that he doubted the authorities would believe him. In particular, Vanderslice thought that it was highly unusual for a first-time drug offender to acquire at least a pound of methamphetamine and then wait months to distribute it. Vanderslice stated that he asked Romo to think more about his story. Vanderslice also made it clear that he did not call Romo a liar, but rather sought only to inform Romo that his story might not be believed by the government and that it was important to tell the government the truth. Vanderslice indicated that no final decision was made about cooperation or anything else at this October meeting.

As noted earlier, Vanderslice received Alarcon's statement in discovery. He discussed it with Romo in January of 2005. Alarcon's statement deepened Vanderslice's concern that Romo was not being fully forthcoming. This was because in January of 2005, and perhaps before, Romo told Vanderslice that he had only distributed drugs to Alarcon three times and those distributions involved 11 to 12 ounces. (Ex. 11.) Alarcon, on the other hand, told the government that there were 10 to 15 distributions and more dope was involved. (Ex. 16.)

Additionally, Vanderslice testified that in January and early February of 2005, Romo decided to enter into a non-cooperation agreement with the government after Vanderslice and Romo conferred. As noted earlier, that Rule 11(c)(1)(C) agreement limited Romo's drug-quantity exposure to a level below that which would have

resulted had Alarcon's statements been used to set the quantity.  The agreement also eliminated Romo's exposure to a 10-year statutory minimum sentence that would have resulted had Romo admitted the conspiracy charged in the second superseding indictment.

Vanderslice's time entries indicate that Vanderslice spent over three hours on separate occasions discussing the non-cooperation plea agreement with Romo.  (Ex. 10 (entries for Jan. 20, 27, 28, 2005 & Feb. 4, 2005).)   The plea agreement Vanderslice and Romo were discussing clearly indicated that: "You agree that cooperation by you with the United States is not anticipated by this agreement, and you understand that a different document would have to be signed should you decide to cooperate in the future."  (Filing 25 ¶ 7.)

Romo appeared before, and Romo's agreement was presented to, Magistrate Judge Piester on February 7, 2005.  Based upon the judge's recommendation, I accepted the plea, but not the plea agreement, on February 28, 2005.  (Filing 31.)

Soon after Vanderslice received the presentence report, and realizing that criminal history would not disqualify Romo, he dictated and then filed an objection to the presentence report because that report had not given Romo a reduction for the "safety valve."  (Ex. 10 (entries dated Mar. 24, 2005 & Apr. 7, 2006); Filing 34 (objection).)  This was necessarily a tentative objection because Vanderslice also knew that Romo had not submitted to the required interview.  Accordingly, Vanderslice set up a meeting with Romo and Navarrette to discuss the "safety-valve" issue.

Vanderslice's time log entry for April 6, 2006, indicated that he had a phone conversation with Romo and Navarrette to arrange a "S.V. ["Safety Valve"] Appnt." (Ex. 10.)  Vanderslice had another call with Romo "re: SV" on April 11, 2005.  (Ex. 10.)

-10-

Vanderslice's handwritten notes, and his time log, both indicate that Vanderslice spoke in person with Romo and Navarrette on April 15, 2005. (Exs. 10 & 12.)   According to the time log, Vanderslice spent one hour discussing the "SV" with Romo.  (Ex. 10 (entry for Apr. 15, 2005).  Vanderslice testified, and his handwritten notes confirm, that Romo told Vanderslice on April 15, 2005, that Romo "would prefer <u>not</u> to do SV ["safety-valve"] interview."   (Ex. 12.)

Vanderslice told me that he clearly told Romo that the only thing that was required of him in order to qualify for the "safety valve" was to give one short interview and tell the complete truth.  He stressed that he would have told Romo that he could reduce his sentence by more than one year if he simply told the government what he knew.  While Vanderslice had no specific recollection of contrasting the differences between providing "cooperation" and giving a "safety-valve interview," Vanderslice believed that he probably would have done so.

Vanderslice also offered a possible explanation for Romo's confusion. Vanderslice said that he probably would have told Romo that any statements made during the "safety-valve" interview would be protected by an agreement similar to the type of agreement that would be signed in the event of cooperation.  It was Vanderslice's practice to require the government to execute an agreement that prohibited the government from using statements made by a client in a "safety-valve" interview against that client.  Vanderslice speculated that perhaps this discussion may have inadvertently confused Romo.  Nonetheless, Vanderslice believed that he had been very clear with Romo, and that it was not reasonable for Romo to have been confused even if such an agreement was discussed.

Vanderslice ended his testimony by suggesting that on April 28, 2005, the day Romo was sentenced, Vanderslice probably would have again confirmed with Romo that Romo did not want to give a "safety-valve" interview. Vanderslice's time log reflects, and Vanderslice remembers hiring a freelance interpreter to assist with, a

-11-

conference about sentencing prior to going to court that day.  (Ex. 10 (entry for Apr. 28, 2005).)  That said, Vanderslice had no specific recollection of having done so, and neither his time logs nor his handwritten notes confirm that a specific discussion about the "safety valve" took place immediately before sentencing.  (Ex. 10 (Entry for Apr. 28, 2005).)

### *Navarrete*

Navarrete is a highly skilled interpreter.  He a certified by both the National Consortium for State Courts and the Federal Court Interpreter Certification Program.  (Ex. 14.)

Navarrete is also extremely well-educated.  He holds a degree in International Law from the Universidad Iberoamericana, Mexico City, Mexico; a B.A. in French, Spanish, and Business from the University of Nebraska-Lincoln; a M.A. in Spanish Linguistics from the University of Nebraska-Lincoln; and a Ph.D. in Modern Languages and Literature from the University of Nebraska-Lincoln.

He has been employed by the Federal Public Defender for the District of Nebraska since 2000.  On a full-time basis, he provides interpretation and translations for the Federal Public Defender and his assistants.

Navarrete testified that he met with Vanderslice and Romo on April 15, 2005.  His time log entry confirms that they discussed the "Safety Valve/Sentencing."  (Ex. 10 (entry dated Apr. 15, 2005).)  Navarrete's handwritten notes also establish that Romo was told that he would likely receive a sentence of "57" months with "SV" and "70" months (the sentence I actually imposed) without that reduction. [7]  (Ex. 15.)

_____

[7]Understanding, as Vanderslice did, that I almost always sentence at the low end of the Guidelines range in cases like this one, the advice recounted in the text was

-12-

I pointedly questioned Navarrete. He told me that he had a specific recollection that Vanderslice told Romo that Romo would <u>not</u> have to testify in order to qualify for the "safety valve."

Navarrete also acknowledged that he, and the lawyers with the Federal Public Defender's office, understood that the differences between providing "cooperation" and providing a "safety-valve" interview can be confusing to clients. As a result, he said that Vanderslice, like all the other lawyers with his office, made a specific practice of carefully explaining that "cooperation" was not required in order to qualify for the "safety valve."

Navarrete additionally observed that Vanderslice did not use a written explanation that had been prepared to illustrate the differences between providing "cooperation" and providing a "safety-valve" interview. On the other hand, Navarrete also testified that only two of the nine defenders in the Nebraska office use that form. Thus, Vanderslice followed the majority practice of relying upon an oral explanation.

## II.  DISCUSSION

Romo argues that Vanderslice confused him about "cooperation" and the "safety valve." As a result of this confusion, the defendant failed to take advantage of the "safety valve." Consequently, Romo asserts that he is entitled to resentencing

---

correct. Had Romo been eligible for the "safety valve," his total offense level would have been 25. With a criminal history category of I, the low end of his Guidelines imprisonment range would have been 57 months. U.S.S.G., Chap. 5, Part A, Sentencing Table.

because Vanderslice rendered ineffective assistance of counsel.   I respectfully disagree.[8]

## A.   The Law

In order to prove his ineffective assistance of counsel claim, Romo must establish two things.  See, e.g., United States v. Thammavong, 378 F.3d 770, 772-73 (8th Cir. 2004) (affirming denial of § 2255 motion; defense counsel's failure to pursue "safety-valve" reduction did not constitute deficient performance, given counsel's reasonable, but ultimately incorrect, assumption that a Rule 35 motion for "substantial assistance" would be forthcoming); United States v. Boothroyd, 403 F. Supp. 2d 1011, 1014, 1018 (D. Or. 2005) (granting § 2255 motion; where the defendant had earlier refused to cooperate with the government, and counsel mistakenly believed that a gun would disqualify his client, defense counsel nevertheless wrongly failed to explain to his client that he might qualify for the "safety valve" and thus "petitioner remained ignorant of the significant advantages possible for providing truthful disclosure").

First, Romo "must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland v. Washington, 466 U.S. 668, 687 & 698-99 (1984) (in a case questioning counsel's performance at a sentencing proceeding that resulted in imposition of the death

---

[8]This is not the first time that a Nebraska federal defender has been attacked for allegedly failing to give proper advice regarding the "safety valve."  See United States v. Valdovinos, 2006 WL 1314325 (D. Neb. May 11, 2006) (denying § 2255 motion where, after an evidentiary hearing, Chief Judge Bataillon found that despite the defendant's assertion to the contrary, First Assistant Federal Public Defender Shannon O'Connor twice advised his client that in order to receive the benefits of the "safety valve," he must provide an interview).

penalty, the Court held that: (1) proper standard for attorney performance is that of reasonably effective assistance; (2) defense counsel's strategy at sentencing hearing was reasonable and, thus, defendant was not denied effective assistance of counsel; and (3) even assuming challenged conduct of counsel was unreasonable, defendant suffered insufficient prejudice to warrant setting aside his death sentence).   In considering whether this showing has been accomplished, "[j]udicial scrutiny of counsel's performance must be highly deferential." Id. at 689.   In other words, a judge should seek to "eliminate the distorting effects of hindsight" by examining counsel's performance from counsel's perspective at the time of the alleged error. Id.

Second, Romo "must show that the deficient performance prejudiced the defense." Id. at 687.  This requires him to demonstrate "[a] reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

### B.   This Case

I first address whether Vanderslice's performance was deficient.  In that vein, I also discuss Romo's criticisms of Vanderslice.  Then I address (but do not decide) the prejudice question.

### Vanderslice Performed Properly

Where a client is willing to admit his guilt and at the same time expresses a reluctance to "cooperate" with the government, but the client may also be eligible to reduce his prison time by invoking the "safety valve," it would constitute deficient performance if a lawyer failed to take reasonable steps to explain to his client the differences between the two alternatives.  On the other hand, when a criminal defendant challenges his lawyer's advice on "cooperation" and the "safety valve," the defendant must overcome the "strong presumption that counsel's conduct falls within

-15-

the wide range of reasonable professional assistance" in order to prove a claim of ineffective assistance of counsel.  <u>Strickland</u>, 487 U.S. at 689.

After careful consideration, I find and conclude that Vanderslice took the steps reasonably necessary to explain the differences between "cooperation" and the "safety valve."   Therefore, I decide that Romo has failed to prove the first element of his claim.

Among other reasons, I arrive at this decision because of the following:

*      Vanderslice and Navarrete kept contemporaneous time logs and they made contemporaneous handwritten notes.   Those notes clearly establish that the "safety valve" was the sole focus of the meeting on April 15, 2005.  Navarrete's notes also unmistakably prove that Romo was correctly told about the sentencing adjustment that Romo could receive for telling the complete truth to the government.

*      Vanderslice spent about three hours discussing a non-cooperation plea agreement with the defendant in January and February of 2005.  The plea agreement they were discussing explicitly stated that cooperation was not anticipated. Vanderslice also spent about one hour in April of 2005 conferring with the defendant about the "safety valve."  Thus, the explicit terms of the non-cooperation agreement coupled with the length and timing of the conferences in January and February of 2005 and in April of 2005 strongly suggest that Vanderslice took care to explain, and distinguish between, "cooperation" and the "safety valve."

*      Navarrete had a specific recollection that, on April 15, 2005, Vanderslice differentiated between "cooperation" and the "safety valve" by telling Romo that he would not be required to testify in order to take advantage of the "safety valve."

-16-

### *Romo's Criticisms of Vanderslice Lack Merit*

Romo makes various arguments about how Vanderslice might have done a better job.  Although forcefully made, these arguments are beside the point.  Simply put, the law does not allow me to play "Sunday morning quarterback."

However, one criticism of Vanderslice's performance warrants somewhat more of a response, albeit a brief one.  Romo questions why Vanderslice told him that law enforcement authorities would be skeptical of his story.  Romo's counsel suggests that perhaps Vanderslice's skepticism caused Romo not to follow through with a "safety-valve" interview with the government.

I fail to see how Vanderslice could have handled the matter differently.  Romo's story was odd.  His story was also contradicted in important respects by Alarcon.  Even under the best of circumstances, lying to the government is very risky.  Therefore, Vanderslice appropriately urged Romo to be cautious about repeating any story that was untrue.

 If Romo took Vanderslice's advice to tell the truth as an implicit message not to give a "safety-valve" interview, then Romo, and not Vanderslice, is to blame for such a jaded misunderstanding.  In sum, there is nothing improper, confusing, or contradictory about objectively questioning a client's story, advising the client to tell the complete truth, and also recommending that the client give a "safety-valve" interview.

### *It is Not Necessary to Decide the "Prejudice" Question*

A difficult question arises as to whether Romo has proven prejudice.  While I am willing to assume that Romo would have given a statement to law enforcement authorities but for the alleged malpractice of Vanderslice, Romo must also prove that

-17-

whatever statement he would have given would have been both true and complete and, as a result, he would have become eligible for the "safety valve."  See, e.g., Emezuo v. United States, 357 F.3d 703, 709-710 (7th Cir. 2004) (affirming denial of § 2255 motion asserting ineffective assistance of counsel; defendant's written statement was not entirely truthful and would not have qualified him for a "safety-valve" reduction even if counsel had proffered it to the government, and thus defendant failed to show he suffered prejudice).

As noted earlier, Vanderslice thought Romo's explanation of how he came to be involved in the crime was strange, and so do I.  Moreover, the government had evidence from Alarcon that contradicted at least a portion of Romo's explanation.  Therefore, on this record, one cannot simply conclude that if Vanderslice was negligent, Romo was harmed.

The foregoing acknowledged, I have decided that Vanderslice acted properly.  Therefore, I "need not consider whether the record shows a reasonable probability that [Romo] would have provided a successful safety valve interview, such that he was prejudiced by counsel's advice . . . ."  Thammavong, 378 F.3d at 774.

Accordingly,

IT IS ORDERED that Romo's motion (filing 46) pursuant to 28 U.S.C. § 2255 is denied with prejudice.  Judgment in favor of the government will be entered by separate document.  Again, and finally, I compliment and thank Mr. Lonowski for his service.

October 3, 2006.                      BY THE COURT:

                                      s/Richard G. Kopf
                                      United States District Judge